## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

|                                   |     |                     |
|-----------------------------------|-----|---------------------|
| In Re:                            | )   |                     |
|                                   | )   | Case No. 18-30426   |
| ACE   MOTOR   ACCEPTANCE          | )   | Chapter 11          |
| CORPORATION                       | )   |                     |
|                                   | )   |                     |
|               Debtor.             |     |                     |

---

### EMERGENCY EX-PARTE MOTION OF THE DEBTOR FOR ORDER AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO SECTIONS 361 AND 363 OF THE BANKRUPTCY CODE, GRANTING ADEQUATE PROTECTION, AND SCHEDULING A FINAL HEARING

Ace Motor Acceptance Corporation, the above-captioned debtor and debtor in possession herein (the "Debtor"), by this Emergency Ex-Parte Motion (the "Motion"), respectfully requests the entry of an interim order authorizing the Debtor to use of cash collateral and providing adequate protection for the use thereof, pursuant to sections 105, 361, and 363 under Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") and Rules 4001, 6003(b) of the Federal Rules of Bankruptcy Procedure; and that the Court enter an order allowing the emergency hearing on the motion to be held on shortened notice. In support of these Motions, the Debtor respectfully represents and states as follows:

### JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue of this case and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2). The statutory predicates for relief requested herein are sections 105, 361, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 4001, 6003 and 6004.

### BACKGROUND

1.     The Debtor was founded in 1998. It provides financing for automobile dealerships. From 1998 to 2009 the Debtor focused on a point of sale special finance program. In 2010, the Debtor added a program offering financing to "BHPH" (Buy Here Pay Here) dealers.  In 2011, the Debtor developed and trademarked a program known as "BHPH in a Box™".  BHPH in a Box™ provides a wide array of benefits to BHPH dealers including capital to fund receivables and floor plan lines to fund inventory. The Debtor offers BHPH dealers services including training, insurance tracking and financial reporting. s package to assist dealers in many aspects of running a BHPH dealership.  The Debtor operates in 10 states.

2.     The Debtor has made a business decision to liquidate its business in Chapter 11. The Debtor's assets consist primarily of receivables due to it from various automobile dealers.  The Debtor estimates that it will take three to five months to liquidate its assets in a manner that will maximize the return for creditors. The face value of the receivables is approximately $29,000,000.00.

3.      The Debtor is indebted to Hamilton State Bank, a Georgia banking corporation ("Lender") under a revolving line of credit loan for up to $16 million (the "Loan") that is evidenced by, among other instruments, that certain Loan Agreement dated November 1, 2016, between the Debtor and Lender (as modified and amended from time to time, and together with the other documents that evidence, secure, guaranty or relate to the Loan, the "Loan Documents").

4.      Lender contends that the outstanding principal balance of the indebtedness owed under the Loan Documents as of the Petition Date is approximately $10,416,450.75 not including Lender's claims for interest, charges, fees (including attorney's fees), expenses, penalties or other possible amounts (the "Senior Debt"), and that the Senior Debt is secured by a first priority lien and security interest granted to Lender upon substantially all of the assets of the Debtor, including (i) all of the Debtor's accounts and accounts receivable, (ii) all of the Debtor's chattel paper, (iii) all of the Debtor's contract rights and general intangibles, including trademarks and deposit accounts, (iv) all of the Debtor's books and records, including customer lists, (v) all of the Debtor's furniture, fixtures and equipment, (vi) all of the Debtor's inventory and all other tangible personal property of the Debtor, (vii) all monies of the Debtor on deposit with Lender as of the Petition Date, and (vii) all licenses and authorizations issued to the Debtor (collectively, and as further defined in the Loan Documents, the "Pre-Petition Collateral").

5.      The Debtor alleges that it has separately granted security interests or liens in some or all of the Pre-Petition Collateral to the following related persons or entities (collectively, the "Junior Creditors"): John G. Algood Living Trust; Russell E. Algood Revocable Trust; Steven A. Cook; Malvin Algood; Jeffrey Algood; Polly Williams; Stuart Algood; Shirley Cook; Don Brown; and The Malvin L. Algood Living Trust.  The liens and security interests in the Pre-Petition Collateral were allegedly granted to the Junior Creditors (the "Junior Liens") to secure [certain loan(s) extended by one or more of the Junior Creditors to the Debtor (the "Junior Debt"), and the Junior Liens are alleged to be junior and/or subordinate to the Lender's security interests and liens in the Pre-Petition Collateral.  As of the Petition Date, the principal amount of the Junior Debt equals approximately $7,000,00000.

6.      The monies and income derived from the Pre-Petition Collateral constitute "cash collateral" of the Lender and Junior Creditors within the meaning of 11 U.S.C. §§ 363(a) and 363(c)(2), and such monies are referred to herein as "Cash Collateral".

7.      The Debtor requires the use of certain Cash Collateral to adequately maintain or operate its business, and serious harm to the Debtor and the Debtor's estate may occur absent the Debtor's use of the Cash Collateral.

8.      As evidenced by the attached proposed Emergency Interim Consent Order (I) Authorizing the Debtor's Use of Cash Collateral, (II) Granting Adequate Protection, and (III) Scheduling a Final Hearing (the "Order"), signatures of the parties or their representatives below, the  Debtor, the Lender and the Junior Creditors consent to the entry of this Order, and sufficient cause exists for granting the relief set forth herein. The United States Bankruptcy Administrator's Office has approved the form and content of the Order.

## REQUEST FOR AUTHORITY TO USE CASH COLLATERAL

9.      The Debtor seeks authority to use cash collateral, on an interim basis, to operate in the ordinary course of business. The Debtor proposes to use the cash collateral in accordance with a budget

(the "Budget") which is attached to the proposed Order.

10.     Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor in possession may not use cash collateral without consent of the secured party or court approval. 11 U.S.C. §363(c)(2). After notice and a hearing, the Court may approve a debtor's use of cash collateral without the secured creditor's consent, but "to the extent necessary to avoid immediate an irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b).

11.     In order for a court to authorize the use of cash collateral over a secured party's objection, the secured party's interest in the cash collateral must be adequately protected. In the context of a cash collateral motion, the purpose of adequate protection is to protect the secured lender from a diminution in the value of its collateral during the period in which it is prevented from foreclosing upon such collateral by the automatic stay. *In re Delta Resources, Inc.*, 54 F.3d 722, 728-30 (11th Cir. 1995). The proposed Order and exhibits thereto set forth the adequate protection which has been agreed to, on an interim basis.

12.     A search of the UCC filings with the North Carolina Secretary of State show that only the Lender and the Junior Creditors have filed financing statements which would perfect an interest in the Debtor's cash collateral.

13.     The Debtor will suffer immediate and irreparable harm without the interim relief requested. In the absence of a court order authorizing the use of cash collateral, the Debtor will be unable to meet its operating expenses and will be forced to cease operations immediately, rather than reorganizing its business structure in order to maximize value for the bankruptcy estate and creditors. Without immediate access to cash, the Debtor's inability to pay its ordinary operating expenses would lead to a quick collapse of its business.

14.     The value of the Debtor's assets and the collateral, especially the receivables, will deteriorate rapidly if the Debtor is not permitted to access cash collateral. As a result, the Debtor's ability to fashion an effective plan to satisfy secured, priority, and other claims will be irreparably impaired.

15.     Therefore, the Debtor requests that this Court grant it interim authority to use cash collateral in accordance with the terms of the Budget until the final hearing as provided for in the Order.

16.     The Debtor proposes to serve this Motion and the Order, by regular mail, no later than two days after entry of the Order in accordance with the Local Bankruptcy Rules to: (i) the Bankruptcy Administrator, (ii) the Lender, (iii) the Junior Creditors or their authorized representative, (iv) the Debtor's 20 largest creditors, (v) the IRS, and (vi) any other parties that are known to assert an interest in the Cash Collateral.

WHEREFORE, the Debtor respectfully requests that the court grant the relief requested herein and such further and other relief as is just and proper.

Dated:          March 23, 2018

**THE HENDERSON LAW FIRM**

 /s/James H. Henderson

James H. Henderson
State Bar No. 13536
1201 Harding Place
Charlotte NC 28204-2826
Telephone:      704.333.3444
Facsimile:      704.333.5003
Email:          henderson@title11.com

**EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| **In Re:** | ) | |
| | ) | **CASE NO. 18-30426** |
| **ACE MOTOR ACCEPTANCE** | ) | |
| **CORPORATION** | ) | **CHAPTER 11** |
| | ) | |
| **Debtor.** | ) | |
| | ) | |

**EMERGENCY INTERIM CONSENT ORDER (I) AUTHORIZING THE DEBTOR'S**
**USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE**
**PROTECTION, AND (III) SCHEDULING A FINAL HEARING**

Before the Court is the *Emergency Motion of the Debtor For Order Authorizing The Use of Cash Collateral Pursuant to Sections 361 and 363 of the Bankruptcy Code; Motion for Hearing on Shortened Notice* (the "**Motion**") [Docket No. __] filed by debtor ACE Motor Acceptance Corporation (the "**Debtor**"). Having reviewed and considered the record, and it appearing to the Court that the Debtor, the Lender (as defined herein) and the Junior Creditors (as defined herein) stipulate and consent to the findings of fact and the terms of relief granted in this Order, the Court HEREBY FINDS AS FOLLOWS:

        A.      On March 15, 2018 (the "**Petition Date**"), the Debtor filed its voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"). The Debtor continues in possession of its property and operating its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

CC Order v4

B.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

C.     The Debtor provides financing for automobile dealerships, including for dealerships that are described or referred to as "Buy Here, Pay Here" automobile dealerships.

D.     The Debtor is indebted to Hamilton State Bank, a Georgia banking corporation ("**Lender**") under a revolving line of credit loan for up to $16 million (the "**Loan**") that is evidenced by, among other instruments, that certain Loan Agreement dated November 1, 2016, between the Debtor and Lender (as modified and amended from time to time, and together with the other documents that evidence, secure, guaranty or relate to the Loan, the "**Loan Documents**").

E.     Lender contends that the outstanding principal balance of the indebtedness owed under the Loan Documents as of the Petition Date is approximately $10,416,450.75 not including Lender's claims for interest, charges, fees (including attorney's fees), expenses,  penalties or other possible amounts (the "**Senior Debt**"), and that the Senior Debt is secured by a first priority lien and security interest granted to Lender upon substantially all of the assets of the Debtor, including (i) all of the Debtor's accounts and accounts receivable, (ii) all of the Debtor's chattel paper, (iii)  all of the Debtor's contract rights and general intangibles, including trademarks and deposit accounts, (iv) all of the Debtor's books and records, including customer lists, (v) all of the Debtor's furniture, fixtures and equipment, (vi) all of the Debtor's inventory and all other tangible personal property of the Debtor, (vii) all monies of the Debtor on deposit with Lender as of the Petition Date, and (vii) all licenses and authorizations issued to the Debtor (collectively, and as further defined in the Loan Documents, the "**Pre-Petition Collateral**").

F.     The Debtor alleges that it has separately granted security interests or liens in some or all of the Pre-Petition Collateral to the following related persons or entities (collectively, the "**Junior

2

CC Order v4

**Creditors**"): John G. Algood Living Trust; Russell E. Algood Revocable Trust; Steven A. Cook; Malvin Algood; Jeffrey Algood; Polly Williams; Stuart Algood; Shirley Cook; Don Brown; and The Malvin L. Algood Living Trust.    The liens and security interests in the Pre-Petition Collateral were allegedly granted to the Junior Creditors (the "**Junior Liens**") to secure certain loan(s) extended by one or more of the Junior Creditors to the Debtor (the "**Junior Debt**"), and the Junior Liens are alleged to be junior and/or subordinate to the Lender's security interests and liens in the Pre-Petition Collateral.  As of the Petition Date, the principal amount of the Junior Debt equals approximately $7,000,000.00.

G.    For purposes of this Order, the monies and income derived from the Pre-Petition Collateral constitute "cash collateral" of the Lender and Junior Creditors within the meaning of 11 U.S.C. §§ 363(a) and 363(c)(2), and such monies are referred to herein as "**Cash Collateral**"**.**

H.    The Debtor requires the use of certain Cash Collateral to adequately maintain or operate its business, and serious harm to the Debtor and the Debtor's estate may occur absent the Debtor's use of the Cash Collateral.

I.    As evidenced by the signatures of the parties or their counsel below, the  Debtor, the Lender and the Junior Creditors consent to the entry of this Order, and sufficient cause exists for granting the relief set forth herein.

J.    As reflected by the certificate(s) of service filed by the Debtor with the Court, and in accordance with Bankruptcy Rules 2002, 4001 and 9014, and the Local Bankruptcy Rules, adequate notice under the circumstances of the Motion and the emergency relief requested in the Motion has been provided by the Debtor to all parties required or entitled to receive notice, including to (i) the Bankruptcy Administrator, (ii) the Lender, (iii) the Junior Creditors or their authorized representative, (iv) the Debtor's 20 largest creditors, (v) the IRS, and (vi) any other parties that are known to assert an interest in the Cash Collateral.  The Debtor has made reasonable efforts to afford the best notice possible

3

CC Order v4

under the circumstances and the notice given by the Debtor complies with Bankruptcy Rules 2002 and

4001.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED AS**

**FOLLOWS:**

1. <u>Interim Relief Granted</u>. The Motion is granted on an interim basis according to

the terms and provisions of this Order.  As used herein, the term "**Interim Period**" shall mean the period

commencing from the Petition Date and ending on the sooner to occur of (a) April 24, 2018, and (b) a

Termination Event (as defined in Section 12 below).

2. <u>Authorization To Use Cash Collateral</u>.   During the Interim Period, the Debtor is

authorized to use Cash Collateral to pay (a) the fees owed in this case by the Debtor to the Office of the

Bankruptcy Administrator, provided that such fees shall be paid first from any other income and monies

of the Debtor's estate that do not constitute Cash Collateral of the Lender, and (b) the monthly expenses

items in the budget attached hereto as <u>Exhibit "A"</u> (the "**Budget**") that are actually incurred by the

Debtor in the ordinary course of its business and that are not prohibited by any provision of this Order

(the "**Authorized Expense Payments**").    Such payments by the Debtor shall not exceed the amounts

listed in the Budget by more than five percent (5%) with respect to any single line item or by more than

ten percent (10%) with respect to all line items in the aggregate, unless the Debtor first receives

Lender's written consent.   Unless and until Lender acknowledges in writing that the Senior Debt owed

to Lender has been paid and satisfied in full, no Cash Collateral shall be paid by the Debtor to the Junior

Creditors or to any other party with respect to any indebtedness secured by the Junior Liens.   No Cash

Collateral shall be used pursuant to the Budget to pay any pre-petition claim against the Debtor other

than (x) amounts specifically approved by the Court, including payroll, and (y) payments made to the

Lender for application to the Senior Debt as provided in Section 6(b) of this Order.

CC Order v4

3.      DIP Account(s). All Cash Collateral received by the Debtor shall be deposited into one or more debtor-in-possession bank accounts at financial institutions that are FDIC-insured (the "**DIP Account(s)**") and shall be segregated from any other monies received by the Debtor that do not constitute Cash Collateral of Lender, or at a minimum, such Cash Collateral shall be accounted for on Debtor's books and records such that the Cash Collateral of Lender is clearly and separately identifiable from any other monies that may be commingled with the Cash Collateral, and in the event of such commingling, the Debtor shall be deemed to have disbursed the non-Cash Collateral funds on a first-out basis  prior to disbursing the Cash Collateral of Lender.     All disbursements from the DIP Accounts shall be accounted for in the monthly debtor-in-possession operating reports to be filed by the Debtor with the Court.

4.      Funds In Accounts with Lender.  So long as a Termination Event shall not have occurred, the Debtor shall be entitled to access and utilize Cash Collateral that may be on deposit, either now or in future, in the bank accounts that the Debtor established pre-petition with Lender (the "**Lender Deposit Accounts**"), and Lender shall allow Debtor to transfer Cash Collateral that may be located in such Lender Deposit Accounts in accordance with the normal practices that were followed by the parties prior to the Petition Date.

5.      New Financing.   The Debtor may use up to a maximum $300,000.00 of Cash Collateral of the Lender, or such additional amounts as Lender may expressly consent to in writing, to make or purchase new vehicle loans in the ordinary course of the Debtor's business, but only if such loans would constitute an eligible receivable under the "Borrowing Base" formula set forth in the Loan Documents with Lender.

CC Order v4

6.     <u>Lender Adequate Protection</u>. For purposes of providing adequate protection to the Lender for the Debtor's use of Cash Collateral, the following items shall be provided to Lender or, as applicable, undertaken by Debtor.

a)     <u>Lender Replacement Liens</u>. Without limiting any security interests or liens that are granted or extended to Lender pursuant to 11 U.S.C. § 552(b), Lender is hereby granted a security interest in all of the Debtor's post-petition property and assets that are of the same type and kind as described in the Loan Documents (the "**Post-Petition Collateral**" and together with the Pre-Petition Collateral, the "**Lender Collateral**"), including without limitation, all of the Debtor's post-petition accounts receivables and chattel paper, and all proceeds therefrom (the "**Lender Replacement Liens**").   Notwithstanding anything to the contrary, the Lender Replacement Liens shall <u>not</u> extend to the proceeds received by Debtor or the Debtor's estate pursuant to any avoidance actions arising under Sections 544, 547, 548, 549, 550 or 553 of the Bankruptcy Code.   The Lender Replacement Liens shall secure repayment of the Senior Debt owed to Lender but in an amount equal to the diminution in value of the Lender's interest in the Pre-Petition Collateral resulting from (i) the Debtor's use of Cash Collateral, or (ii) the imposition of the automatic stay and the Debtor's use, sale, consumption or disposition of such Pre-Petition Collateral.   The Lender Replacement Liens shall have the same validity and priority as Lender's security interests and liens in the Pre-Petition Collateral as of the Petition Date, and they shall be deemed automatically valid and perfected upon entry of this Order without further filing or recordation by Lender or the Debtor.

b)     <u>Cash Payments</u>.   On a weekly basis, the Debtor shall pay to Lender a sum equal to the amount of cash received by Debtor from collections (or that otherwise come into Debtor's control or possession) that is in excess of the Authorized Expenses Payments allocated for

6

payment that week in the Budget (the "**Excess Cash Payments**").  Such Excess Cash Payments

are generally projected at the first page of attached Exhibit "B" in the line item labeled "Cash

Remaining Payable to HSB".   Such Excess Cash Payments shall be made to Lender by 1:00 pm

on the Friday of each consecutive week following the entry of this Order.   Lender shall be

entitled to apply the Excess Cash Payments to the outstanding Senior Debt until such

indebtedness and obligations are paid and discharged in full.  To the extent there is any dispute

regarding Lender's application of such cash proceeds, such dispute is reserved for future

adjudication by this Court.

      c)    Financial Reports.   On a weekly basis, the Debtor shall provide cash flow reports

to Lender in substantially the same form attached hereto as Exhibit "B"  (the "**Cash Collateral**

**Reports**") unless a different form of reporting is agreed to by Lender in writing.   Such weekly

Cash Collateral Reports shall be due at the same that the weekly Excess Cash Payments are due

to Lender.

      d)    Insurance.   The Debtor shall obtain or maintain insurance for the Lender

Collateral to the extent such insurance is required under the terms and provisions of the Loan

Documents (if at all), and upon request the Debtor shall provide proof of any such required

insurance to Lender.

      e)    Proof of Incurred Expenses. Upon request by Lender, the Debtor shall provide

copies of any invoices or other documents to substantiate any Authorized Expense Payments

made by the Debtor.

      f)    Inspection Access.   Lender and its respective representatives and agents shall be

authorized, during normal business hours, to audit, inspect or examine the Lender Collateral or

CC Order v4

the Debtor's books and records; provided, however, that the Debtor and Debtor's counsel must

be provided with at least two (2) days prior notice of the intent of Lender or any such

representative to do so.   The Debtor shall cooperate in providing Lender with information or

copies of documents reasonably requested by Lender with respect to the Lender Collateral,

including  copies of dealer agreements or other documents  pertaining to the Debtor's receivables

and chattel paper.

7.    Superpriority Claim.  To the extent the Lender Replacement Liens do not provide

Lender with adequate protection of its interests in the Pre-Petition Collateral, then Lender shall be

entitled to a super-priority administrative expense claim under Section 507(b) of the Bankruptcy Code as

necessary to fully compensate Lender for the use of its Cash Collateral by the Debtor.

8.    Junior Creditors Replacement Liens.   For purposes of providing adequate

protection to the Junior Creditors for the Debtor's use of Cash Collateral, and without limiting any

security interests or liens that are granted or extended to Lender pursuant to 11 U.S.C. § 552(b), the

Junior Creditors are hereby granted a security interest in all of the Debtor's post-petition property and

assets that are of the same type and kind as described in the loan documents that evidence the Junior

Debt (the "**Post-Petition Collateral**" and together with the Junior Creditor's interests in the Pre-Petition

Collateral, the "**Junior Creditors Collateral**"), including without limitation, all of the Debtor's post-

petition accounts receivables and chattel paper, and all proceeds therefrom (the "**Junior Creditors**

**Replacement Liens**").  Notwithstanding anything to the contrary, the Junior Creditors Replacement

Liens shall <u>not</u> extend to the proceeds received by Debtor or the Debtor's estate pursuant to any

avoidance actions arising under Sections 544, 547, 548, 549, 550 or 553 of the Bankruptcy Code.   The

Junior Creditor Replacement  Liens  shall secure repayment of the Junior Debt but in an amount equal to

the diminution in value of the Junior Creditors' interest in the Pre-Petition Collateral resulting from (a)

8

the Debtor's use of Cash Collateral, or (b) the imposition of the automatic stay and the Debtor's use, sale, consumption or disposition of such Pre-Petition Collateral.   The Junior Creditors Replacement Liens shall have the same validity and priority as the Junior Creditors' security interests and liens in the Pre-Petition Collateral as of the Petition Date, and they shall be deemed automatically valid and perfected upon entry of this Order without further filing or recordation by the Junior Creditors or the Debtor.

9.    Deadline for Objection to Lender's Claim.   Any challenges or objections (collectively, a "**Challenge**") to the Lender's claim (the "**Lender Claim**") by the Debtor including (a) any objection to the amount, validity, perfection, enforceability, priority, or extent of the Senior Debt or any security interests relating thereto, or (b) any defense, claim, cause of action, or offset against Lender relating to any actions or failure to act with respect to the Lender's Loan Documents, shall be made by initiating an appropriate contested matter or adversary proceeding that is timely filed no later than  60 days from the engagement of counsel for the Committee of Unsecured Creditors, or, if no counsel or Committee is appointed, ninety (90) days after the Petition Date in the Debtor's case (the "**Objection Deadline**").   In the event a Challenge is not timely filed by the Objection Deadline, then the Debtor shall be deemed to have waived any objections or defenses to the Lender Claim and the Debtor shall be deemed to have stipulated and agreed that the amount of the debt set forth in the Lender Claim constitutes a fully secured, allowed claim that is not subject to defense, counterclaim, setoff, recharacterization or subordination; provided, however, the Debtor shall retain the limited right to object to the reasonableness of any post-petition fees and charges (including attorney's fees) that are not quantified in the Lender Claim at the time it is filed with the Court and that are incurred or quantified by Lender after the Lender Claim is filed.   Notwithstanding the foregoing, the stated Objection Deadline shall not apply to any subsequently appointed Chapter 11 Trustee or Chapter 7 Trustee for the Debtor;

9

provided, however, nothing herein shall preclude Lender from requesting a modification of the terms of this Section 9 in any final order on the Motion.

10.   <u>Cash Collateral Subject to Liens</u>. Until expended by the Debtor, all Cash Collateral shall remain subject to the asserted liens and claims of Lender and the Junior Creditors under their respective loan documents and this Order.

11.   <u>Modification of Automatic Stay</u>. The automatic stay provisions of Section 362 of the Bankruptcy Code are hereby modified and lifted to the extent necessary to implement the provisions of this Order and permit Lender to apply payments received from the Debtor to the Senior Debt and, if deemed desirable by Lender, to file or record any instruments to evidence, validate, or perfect the Lender Replacement Liens or other adequate protection granted by this Order to Lender.

12.   <u>Termination of Cash Collateral Usage</u>. The Debtor's authorization to use Cash Collateral shall terminate immediately upon the occurrence of any one or more of the following events (each a "**Termination Event**"): (i) the conversion or dismissal of the Debtor's chapter 11 case; (ii) failure by the Debtor to pay or provide  to Lender the Excess Cash Payments and Cash Flow Reports that are required pursuant to this Order if not cured within three (3) days after delivery by Lender to Debtor (and copy by email and regular mail to Debtor's counsel) of written notice of such default; (iii) the entry of an Order by the Court granting relief from the automatic stay to Lender to foreclose upon the Lender Collateral; (iv) the entry of an Order appointing a Chapter 11 Trustee for the Debtor or authorizing the sale of substantially all of the assets of the Debtor; (v) the Debtor's breach of any other obligations imposed by the terms and provisions of this Order if not cured within ten (10) days after delivery to Debtor (and copy by email and regular mail to Debtor's counsel) of written notice of such default; or (vi) this Order is amended, vacated, stayed, or reversed without the prior written consent of Lender.   Upon the occurrence of a default by the Debtor with respect to its obligations to pay or provide

CC Order v4

10

the Excess Cash Payments and Cash Flow Report, Lender may temporarily freeze all Lender Deposit

Accounts with the Debtor until such time as the default is timely cured or until the Court rules on any

emergency motion for stay relief that is promptly filed by Lender after such default.

13.     Survival of Provisions of This Order. The provisions of this Order and any action

taken pursuant to the terms hereof shall survive the entry of any order that may be entered dismissing

this case or converting the case to Chapter 7 of the Bankruptcy Code, and the liens granted pursuant to

this Order shall continue and shall retain their priority in this case or in any superseding case under the

Bankruptcy Code.

14.     Order Immediately Effective. Notwithstanding anything to the contrary in the

Federal Rules of Bankruptcy Procedure or otherwise, the effectiveness of this Order shall not be stayed,

and this Order shall be immediately effective upon its entry

15.     Reservation of Rights.   This Order shall not be construed as an adjudication by

the Court respecting the nature, amount, validity, priority or perfection of any pre-petition liens or

security interests asserted against the Debtor or the Debtor's property.   Furthermore, this Order shall not

be construed as a waiver by the  Debtor, the Lender, or the Junior Creditors of any rights, claims,

defenses, or objections they may have (a) respecting any requests for relief from the automatic stay

under 11 U.S.C. § 362(d), (b) respecting demands for further adequate protection in addition to those

provided by this Order, (c) respecting any future requests by either party to modify the terms of this

Order, (d) respecting any claims or assertions regarding diminution in value of the collateral securing the

Senior Debt or the Junior Debt,  (e) respecting any other forms of relief that Lender may seek in the

Debtor's case, including seeking the appointment of a trustee or emergency motions to terminate the use

of Cash Collateral, or (f) respecting any request by Lender to seek in any final order for this Motion a

shortened time period for the Objection Deadline pertaining to the Lender Claim.  Any interested party

11

may move for a modification or reconsideration of this Order at any time.  Nothing herein waives Lender's right to seek additional adequate protection or relief in any final order pertaining to the Motion.

       16.    <u>Final Hearing</u>.  A final hearing on the Motion shall be held on April 24,  2018 at 9:30 a.m. in Courtroom 1-4, United States Bankruptcy Court, 401 W. Trade Street, Charlotte, North Carolina 28202  (the "**Final Hearing**").  Debtor's counsel shall serve this Interim Order (which shall constitute adequate notice of the Final Hearing) upon all known parties that are required or entitled to receive notice and shall file a certificate of service with the Court.  Any parties objecting to the relief set forth herein shall file a written objection with the Court no later than three business days prior to the Final Hearing.

| **DEBTOR**<br>Consented To:<br><br>/s/James H. Henderson<br>James H. Henderson<br>State Bar No. 13536<br>THE HENDERSON LAW FIRM<br>1201 Harding Place<br>Charlotte NC 28204-2826<br>Telephone:   704.333.3444<br>Facsimile:   704.333.5003<br>Email:     henderson@title11.com<br>*Proposed Counsel for Debtor ACE Motor*<br>*Acceptance Corporation* | **LENDER**<br>Consented To:<br><br> /s/ Ashley A. Edwards<br>Ashley A. Edwards, Esq. (N.C. Bar No. 40695)<br>Kiah T. Ford IV, Esq. (N.C. Bar No. 20979)<br>PARKER POE ADAMS & BERNSTEIN LLP<br>Three Wells Fargo Center<br>401 S. Tryon Street, Suite 3000<br>Charlotte, NC  28202<br>Tel: (704) 335-9534<br>Fax: (704) 334-4706<br><br>-- and -- |
| **JUNIOR CREDITORS**<br>Consented To:<br><br><br>/s/ Russell Algood<br>Russell Algood, with permission | Brad Baldwin<br>Georgia Bar No. 034220<br>Hecht Walker, P.C.<br>205 Corporate Center Drive, Suite B<br>Stockbridge, GA 30281<br>(404) 348-4881 |

CC Order v4

| | |
|---|---|
| *Authorized Representative for*<br>*The Junior Creditors* | *Counsel for Hamilton State Bank* |

# Exhibit "A"
# Budget

CC Order v3

| | March | April | May | June | July |
|---|---|---|---|---|---|
| Average Receivables | 28,836,369 | 26,689,403 | 20,603,758 | 13,672,895 | 8,277,703 |
| | 1 | 0.93 | 0.71 | 0.47 | 0.29 |
| | (0.07) | (0.21) | (0.24) | (0.19) | (0.10) |

| G&A EXPENSES | March | April | May | June | July |
|---|---|---|---|---|---|
| **Fixed** | | | | | |
| RENT | 12,600 | 12,600 | 12,600 | 12,600 | 12,600 |
| Lease Maintenance | 400 | 400 | 400 | 400 | 400 |
| INSURANCE | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| DATA PROCESSING | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 |
| LICENSES & TAXES | 2,417 | 2,417 | 2,417 | 2,417 | 2,417 |
| LEGAL/PROFESSIONAL FEES | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| TRAVEL | 500 | 500 | 500 | 500 | 500 |
| **Variable** | | | | | |
| Debit Card Administrative Fee | 7,058 | 6,532 | 5,043 | 3,346 | 2,026 |
| UTILITIES | 3,000 | 2,777 | 2,144 | 1,422 | 861 |
| TELEPHONE | 12,172 | 11,266 | 8,697 | 5,771 | 3,494 |
| SUPPLIES | 1,500 | 1,388 | 1,072 | 711 | 431 |
| POSTAGE | 4,266 | 3,948 | 3,048 | 2,023 | 1,225 |
| TRAINING | 1,198 | 1,109 | 856 | 568 | 344 |
| OUTSIDE SERVICES | 10,287 | 9,521 | 7,350 | 4,877 | 2,953 |
| Repossession Expense | 13,483 | 12,479 | 9,634 | 6,393 | 3,870 |
| COLLECTION EXPENSE | 1,602 | 1,483 | 1,145 | 760 | 460 |
| Floor Plan Expense | 2,702 | 2,501 | 1,930 | 1,281 | 776 |
| **TOTAL G&A EXPENSES** | 88,185 | 83,921 | 71,835 | 58,071 | 47,356 |
| | | | | | |
| **Payroll** | | | | | |
| NERFETTIE ELLIS-JORDAN | 5,839 | 5,839 | 5,839 | 5,839 | 5,839 |
| TIUANT BENNETT | 2,961 | 2,961 | 2,961 | 2,961 | 2,961 |
| JAY DEVINE | 2,862 | 2,862 | 2,862 | 2,862 | 2,862 |
| MICHAEL EVANS | 3,975 | 3,975 | 3,975 | 3,975 | 3,975 |
| CHASITIE GAINEY | 3,985 | 3,985 | 3,985 | 3,985 | 3,985 |
| SHANNON MARTINEZ | 3,468 | 3,468 | 3,468 | 3,468 | 3,468 |
| LORENA MOLINA | 3,491 | 3,491 | 3,491 | 3,491 | 3,491 |
| JAIR MORALES SALAZAR | 2,961 | 2,961 | 2,961 | 2,961 | 2,961 |
| DENYS SENICH | 2,455 | 2,455 | 2,455 | 2,455 | 2,455 |
| ANAUSHEYA SMITH | 2,369 | 2,369 | 2,369 | 2,369 | 2,369 |
| ROBIN MILESTONE | 7,745 | 7,745 | 7,745 | 7,745 | 7,745 |
| SHANOVAN REDDICK | 3,575 | 3,575 | 3,575 | 3,575 | |
| ROBERT TROY | 3,662 | 3,662 | 3,662 | 3,662 | |
| STEPHANIE CATE | 7,652 | 7,652 | 7,652 | | |
| DEBORAH DUFFY | 3,532 | 3,532 | 3,532 | | |
| DAVID ALGOOD | 12,027 | 12,027 | 6,000 | 6,000 | |
| BEN COLLISON | 5,134 | | | | |
| CARLA MOREFIELD | 4,051 | 4,051 | 4,051 | 4,051 | |
| ROSE MASSEY | 2,661 | 2,661 | | | |
| RACHEL PILLAR | 5,655 | 5,655 | 5,655 | 5,655 | 5,655 |
| NICOLE GREGORY | 4,083 | 4,083 | 4,083 | 4,083 | |
| ANTHONY IANNACONE | 3,391 | 3,391 | 3,391 | | |
| ERIC COGSWELL | 5,715 | 5,715 | 5,715 | | |

| | | | | | |
|---|---|---|---|---|---|
| ÁRINDA STOKES | 4,369 | 4,369 | 4,369 | 4,369 | 4,369 |
| MAX ZAKAS | 5,561 | 5,561 | 5,561 | | |
| BRIAN MCSWEENY | 4,806 | 4,806 | 4,806 | 4,806 | 4,806 |
| RUSS ALGOOD | 15,029 | 15,029 | 15,029 | 15,029 | 15,029 |
| WAYNE GARLAND | 9,000 | 4,000 | 4,000 | | |
| Retention Bonus | - | 12,896 | 14,687 | 11,433 | 6,011 |
| pay due terminated employees | 46,213 | | | | |
| | 188,227 | 144,776 | 137,878 | 104,773 | 77,981 |
| | | | | | |
| Total SG&A | 276,412 | 228,697 | 209,714 | 162,844 | 125,337 |

# Exhibit "B"
## form of Cash Collateral Report

Ace Acceptance Corporation Cash Collateral Report for the week ending:

| Ace Motor Acceptance Corporation Report for Week ending | March 30th | April 7th | April 14th | April 21st |
|---|---|---|---|---|
| Beginning Balance | $ 300,000 | $ 100,000 | $ 100,000 | $ 100,000 |
| Cash Received from all Sources ( Exhibit A) | $ 500,000 | $ 800,000 | $ 1,200,000 | $ 1,400,000 |
| Less last weeks & this weeks  ACH out | $ (163,000) | $ - | | |
| Payments to dealers for fees and contracts | $ (100,000) | $ (100,000) | $ (100,000) | (100,000) |
| Less Expenses Monthly Accrual ( Exhibit B) | $ (87,500) | $ (81,733) | $ (81,733) | (81,733) |
| Less Contingency Hold Back | $ (100,000) | $ (100,000) | $ (100,000) | (100,000) |
| Cash Remaining Payable to HSB | $ 349,500 | $ 618,267 | $ 1,018,267 | $ 1,218,267 |
| Balance of funds payable to HSB | $ 349,500 | $ 618,267 | $ 1,018,267 | $ 1,218,267 |
| Balance of Funds in all bank accounts after giving affect to HSB Payment on line 4 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 |

With herein referenced Exhibits of even date to this dated certification, I certify that the Expenses Monthly Accrual amount figure above is the monthly cash collateral Total SG&A Expense Budget (Exhibit B) divided by 4 weeks.  I also certify that actual expenses paid (Exhibit C) are in compliance with attached Expense Budget (Exhibit B).  I certify that the Weekly Cash Reporting (Exhibit A) is correct.  I certify the that Borrowing Base Certificate (Exhibit D) is correct.

_____
Russ Algood

_____
Date

### Exhibit A

ACE MOTOR ACCEPTANCE WEEKLY CASH REPORTING FOR WEEK ENDING _____   (Date) _____

Outstanding Principal (Sales Contracts)    Outstanding Principal (Floorplan)    Carrying Value Inventory
$          -                               $          -                        $          -

*CASH SOURCES*

**Collection Activity (Sales Contracts)**

| Dealer | AMAC Program | Principal | Interest | Fees | Subtotals |
|--------|--------------|-----------|----------|------|-----------|
|        |              | $      -   | $      -  | $      - | $      - |
|        |              | $      -   | $      -  | $      - | $      - |
|        |              | $      -   | $      -  | $      - | $      - |
| TOTAL  |              |           |          |      | $      - |

**Collection Activity (Floorplan)**

| Dealer | VIN | Interest | Fees | Principal Curtailment | Subtotals |
|--------|-----|----------|------|------------------------|-----------|
|        |     | $      -  | $      - | $      -              | $      - |
|        |     | $      -  | $      - | $      -              | $      - |
|        |     | $      -  | $      - | $      -              | $      - |
| TOTAL  |     |          |      |                        | $      - |

**Buyback of Sales Contracts**

| Dealer | AMAC Program | Principal amt. repurchased | Repurchase Amt | Buyout Fees Paid | Subtotals |
|--------|--------------|----------------------------|----------------|------------------|-----------|
|        |              | $      -                    | $      -        | $      -          | $      - |
|        |              | $      -                    | $      -        | $      -          | $      - |
|        |              | $      -                    | $      -        | $      -          | $      - |
| TOTAL  |              |                            |                |                  | $      - |

**Sale of Inventory on Hand**

| Vehicle VIN | Make | Model | Carrying Value | Sale proceeds |
|-------------|------|-------|----------------|---------------|
|             |      |       | $      -        | $      -       |
|             |      |       | $      -        | $      -       |
|             |      |       | $      -        | $      -       |
| TOTAL       |      |       |                | $      -       |

**Other Sources**

| Source | Amount |
|--------|--------|
|        | $      - |
|        | $      - |
|        | $      - |
|        | $      - |
|        | $      - |

**CASH RECEIVED FROM ALL SOURCES**          $          -

Note: Rows to be expanded to reference all existing dealer relationships. Ace Motor Acceptance Corp should be able to provide contract level detail to HSB upon request.

*Exhibit B*

*Dated 3/22/18*

| | March | April | May | June | July | August | September |
|---|---|---|---|---|---|---|---|
| Average Receivables | 28,836,360 | 26,689,403 | 20,503,758 | 13,672,895 | 8,277,709 | 5,440,796 | 3,372,138 |
| | 1 | 0.98 | 0.29 | 0.71 | 0.47 | 0.29 | 0.19 |
| | (0.07) | (0.21) | (0.24) | (0.19) | (0.10) | (0.07) | 0.12 (0.12) |

**G&A EXPENSES**

| | March | April | May | June | July | August | September |
|---|---|---|---|---|---|---|---|
| **Fixed** | | | | | | | |
| RENT | 12,600 | 12,600 | 12,600 | 12,600 | 12,600 | 12,600 | 12,600 |
| LEASE MAINTENANCE | 400 | 400 | 400 | 400 | 400 | 400 | 400 |
| INSURANCE | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| DATA PROCESSING | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 |
| LICENSES & TAXES | 2,417 | 2,417 | 2,417 | 2,417 | 2,417 | 2,417 | 2,417 |
| LEGAL/PROFESSIONAL FEES | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| TRAVEL | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| **Variable** | | | | | | | |
| Debit Card Administrative Fee | 7,058 | 6,532 | 5,043 | 3,846 | 2,026 | 1,332 | 825 |
| UTILITIES | 3,000 | 2,777 | 2,144 | 1,422 | 861 | 566 | 551 |
| TELEPHONE | 12,172 | 11,266 | 8,697 | 5,771 | 3,494 | 2,297 | 1,423 |
| SUPPLIES | 1,500 | 1,389 | 1,072 | 711 | 431 | 283 | 175 |
| POSTAGE | 4,286 | 3,948 | 3,048 | 2,023 | 1,225 | 805 | 499 |
| TRAINING | 1,195 | 1,109 | 856 | 568 | 344 | 226 | 140 |
| OUTSIDE SERVICES | 10,287 | 9,521 | 7,350 | 4,877 | 2,953 | 5,941 | 1,209 |
| Repossession Expense | 18,483 | 12,479 | 9,634 | 6,393 | 3,870 | 2,344 | 1,577 |
| COLLECTION EXPENSE | 1,602 | 1,488 | 1,145 | 760 | 460 | 302 | 187 |
| Floor Plan Expense | 2,702 | 2,501 | 1,880 | 1,231 | 778 | 510 | 316 |
| **TOTAL G&A EXPENSES** | 88,185 | 83,921 | 71,815 | 58,071 | 47,356 | 41,722 | 37,614 |

**Payroll**

| | March | April | May | June | July | August | September |
|---|---|---|---|---|---|---|---|
| NERFETTIE ELLIS-JORDAN | 5,839 | 5,839 | 5,839 | 5,839 | 5,839 | 5,839 | 5,839 |
| TUANT BENNETT | 2,961 | 2,961 | 2,961 | 2,961 | 2,961 | 2,961 | 2,961 |
| JAY DEVINE | 2,862 | 2,862 | 2,862 | 2,862 | 2,862 | 2,862 | 2,862 |
| MICHAEL EVANS | 3,975 | 3,975 | 3,975 | 3,975 | 3,975 | 3,975 | 3,975 |
| CHASITIE GAINEY | 3,985 | 3,985 | 3,985 | 3,985 | 3,985 | 3,985 | 3,985 |
| SHANNON MARTINEZ | 3,468 | 3,468 | 3,468 | 3,468 | 3,468 | | |
| LORENA MOLINA | 3,491 | 3,491 | 3,491 | 3,491 | 3,491 | | |
| JAIR MORALES SALAZAR | 2,961 | 2,961 | 2,961 | 2,961 | | | |
| DENYS SENICH | 2,455 | 2,455 | 2,455 | 2,961 | 2,961 | | |
| ANAUSHEYA SMITH | 2,369 | 2,369 | 2,369 | 2,455 | 2,455 | | |
| ROBIN MILESTONE | 7,745 | 7,745 | 2,369 | 2,369 | 2,369 | | |
| SHANOVAN REDDICK | 3,575 | 3,575 | 7,745 | 7,745 | 7,745 | 7,745 | 7,745 |
| ROBERT TROY | 3,662 | 3,662 | 3,575 | 3,575 | | | |
| STEPHANIE CATE | 7,652 | 7,652 | 3,662 | 3,662 | | | |
| DEBORAH DUFFY | 3,532 | 3,532 | 7,652 | | | | |
| DAVID ALGOOD | 12,027 | 12,027 | 3,532 | | | | |
| BEN COLLISON | 5,734 | | 6,000 | 6,000 | | | |
| CARLA MOREFIELD | 4,051 | 4,051 | | | | | |
| ROSE MASSEY | 2,661 | 2,661 | 4,051 | 4,051 | | | |
| RACHEL PILLAR | 5,655 | 2,661 | | | | | |
| NICOLE GREGORY | 4,083 | 5,655 | 5,633 | 5,655 | 5,655 | 5,655 | 5,655 |
| ANTHONY IANNACONE | 3,391 | 4,083 | 4,083 | 4,083 | | | |
| ERIC COGSWELL | 5,715 | 3,391 | 3,391 | | | | |
| ARINDA STOKES | 4,369 | 5,715 | 5,715 | | | | |
| MAX ZAKAS | 5,561 | 4,369 | 4,369 | 4,369 | 4,369 | 4,369 | 4,369 |
| BRIAN MCSWEENY | 4,806 | 5,561 | 5,561 | | | | |
| RUSS ALGOOD | 15,029 | 4,806 | 4,806 | 4,806 | 4,806 | 4,806 | 4,806 |
| WAYNE GARLAND | 9,000 | 15,029 | 15,029 | 15,029 | 15,029 | 15,029 | 15,029 |
| Retention Bonus | | 4,000 | 4,000 | | | | |
| | | 12,896 | 14,687 | | | | |
| pay due terminated employees | 46,215 | | | 11,433 | 6,011 | 4,384 | 11,695 |
| | 188,227 | 144,776 | 137,878 | 104,773 | 77,982 | 51,809 | 68,920 |

| | March | April | May | June | July | August | September |
|---|---|---|---|---|---|---|---|
| **Total SG&A** | 276,412 | 228,697 | 209,714 | 162,844 | 125,337 | 103,331 | 106,533 |

*Weekly*
*march — $69,103*
*april — $57,174*
*may — $52,425*
*June — $40,711*

*Divide monthly by 4*
*To determine weekly*

EXHIBIT C

GL PRINT OUT OR SOME VERSION OF LIST OF EXPENSES ACTUALLY PAID
FOR THE WEEK

Date: _____

Reporting
Date: _____

**EXHIBIT D**
**BORROWING BASE CERTIFICATE**

**ACE MOTOR ACCEPTANCE, INC.**
**LOAN# 827473**

1  Finance Contracts (net of U/E, BK, Repo,etc) pledged at previous report date:    1    $ _____ -

2  Finance Contracts (net of U/E, BK, Repo,etc) pledged at this report:    2  $ _____ -

3  Gain or Reduction for Month    3  $ _____ -

4  Ineligible Accounts as of this report date:
   a.  Payments 61 days or more past due    $ _____ -
   b.  Other Ineligibles    $ _____ -
   Total ineligible (a. & b.)    4  $ _____ -

5  Eligible collateral (auto sales contracts)    [Line 2 minus 4 ]    5  $ _____ -

6  40% of Line 5 (NET) eligible auto contracts    6    $ _____ -

7  Floorplan Receivable at report date :    7  $ _____ -

8  Ineligible Floorplan Receivable at report date:
   a.  Past due 120 days    $ _____ -
   b.  Other Ineligible    $ _____ -
   Total ineligible (a. & b.)    8  $ _____ -

9  Eligible collateral (Inventory)    [Line 7 minus Line 8]    9  $ _____ -

10  40% of Line 9 (NET) eligible Floorplan Receivable    10  $ _____ -

11  Net Eligible Collateral Borrowing Base    [Line 6 plus Line10]    11  $ _____ -

12  Facility balance-PRIOR MONTH    $ _____ -
    Plus - advances since last report    $ _____ -
    Less - Principal payments since last report    $ _____ -
    Total facility balance this report    12  $ _____ -    (Limit-$14,500,000.00)

13    **SURPLUS Available**    13  $ _____ -
    [ Line 11 less Line 12 ]

The undersigned Borrower (the "Borrower") hereby transfers, assigns, represents, warrants, certifies and agrees as follows: (i) that the Borrower has fully transferred and assigned, and does hereby fully transfer and assign, to Hamilton State Bank (the "Bank") the Motor Vehicle Retail Installment Contracts listed, described or otherwise referred to in Schedule 1 attached hereto and incorporated herein by this reference, and all receivables, contract documents and other documents related thereto; (ii) that the warranties and representations contained in that certain Loan Agreement between the Borrower and Bank (the "Loan Agreement"), and those set forth in that certain Security Agreement between Bank and Borrower are true and correct; (iii) that no Event of Default has occurred under the Loan Agreement or Security Agreement (other than Events of Default, if any, that have previously been brought to the attention of the Bank and then cured to the satisfaction of the Bank); (iv) that all the receivables, loan documents and other documents related to the Motor Vehicle Retail Installment Contract Items on Schedule 1 hereto have been delivered to the Bank, or to the Bank's Custodian(s) as agent(s) and bailee(s) for the Bank pursuant to its Custodian Agreement(s) with the said custodian(s); (v) that the Borrower has herein or previously transferred, assigned and delivered to the Bank all of the Motor Vehicle Retail Installment Contracts and related contract documents that it currently owns, including those (if any) which are ineligible for inclusion in the borrowing base pursuant to the terms of the Loan Agreement; and (vi) that the information set forth in this Report is true and correct and accurately reflects the status of the various Motor Vehicle Retail Installment Contracts. (The foregoing warranties do not supersede the continuing warranties and representations of the Borrower set forth in the Loan Agreement, Security Agreement or other loan documents.)

By: _____
    **Russ Algood, CEO**

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | Case No. 18-30426 |
| ACE MOTOR ACCEPTANCE CORPORATION | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

---

### CERTIFICATE OF SERVICE

This is to certify that the undersigned has served the attached **EMERGENCY EX-PARTE MOTION OF THE DEBTOR FOR ORDER AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO SECTIONS 361 AND 363 OF THE BANKRUPTCY CODE** via ECF to all parties or their attorney of record requesting notice and the following:

U. S. Bankruptcy Administrator
alexandria_p_kenny@ncwba.uscourts.gov

Hamilton State Bank
c/o Brad A. Baldwin
brad@hmhwlaw.com

This is to further certify that the undersigned has served a copy of the attached **EMERGENCY EX-PARTE MOTION OF THE DEBTOR FOR ORDER AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO SECTIONS 361 AND 363 OF THE BANKRUPTCY CODE** to the Junior Creditors or their authorized representative and to the 20 largest unsecured creditors via first-class mail, postage prepaid to the following:

John G Algood Living Trust
1155 Woodlands Boulevard
Oldsmar, FL 34677

Russell Edward Algood
Revocable Trust
11830 Dan Maples Drive
Charlotte, NC 28277

Steven A Cook
13902 Rue Charlot Lane
Mc Cordsville, IN 46055

Malvin Algood
1499 Riverdale Drive
Oldsmar, FL 34677

Jeffrey Algood
2410 Woolery milll Drive
Bloomington, IN 47403

Pauline Williams
4490 West Crestwood Drive
Bloomington, IN 47404

Stuart Algood
11830 Dan Maples Drive
Charlotte, NC 28277

Shirley Cook
7385 Deerfield Drive
Greenfield, IN 46140

Donald Brown
4421 McCurdy Road
Indianapolis, IN 46234

The Malvin L Algood Living Trust
1499 Riverdale Drive
Oldsmar, FL 34677

Automasters
116 N Main Street
Sweetser, IN 46987

Experian Schaumburg
955 American lane
Schaumburg, IL 60173

Hanover Insurance
PO Box 580045
Charlotte, NC 28258-0045

One Path
170 Chastain Meadows Court
Kennesaw, GA 30144

Pitney Bowes Purchase Power
PO Box 371874
Pittsburgh, PA 15250-7874

Toshiba
PO Box 790448
Saint Louis, MO 63179-0448

Windstream
PO Box 9001908
Louisville, KY 40290-1908

Internal Revenue Service
Centralized Insolvency Operations
PO Box 7346
Philadelphia, PA 19101-7346

AutoScribe
9711 Washingtonian Blvd
Gaithersburg, MD 20878

Experian
PO Box 881971
Los Angeles, CA 90088-1971

Guardian
PO Box 824404
Philadelphia, PA 19182-4404

Liberty Mutual Insurance
PO Box 2015
Keene, NH 03431-7051

Pitney Bowes Global
PO Box 371887
Pittsburgh, PA 15250

United Healthcare
PO Box 94017
Palatine, IL 60094-4017

Dated: March 23, 2018.

**THE HENDERSON LAW FIRM**

**/s/**James H. Henderson
James H. Henderson
State Bar No. 13536
1201 Harding Place
Charlotte NC 28204-2826
Telephone:      704.333.3444
Facsimile:      704.333.5003
Email:          henderson@title11.com