## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| In Re: ) | |
| ) | Case No. 18-30426 |
| ACE MOTOR ACCEPTANCE ) | Chapter 11 |
| CORPORATION ) | |
| ) | |
| Debtor. | |

## MOTION OF DEBTOR FOR ENTRY OF AN ORDER APPROVING PAYMENT OF RETENTION BONUSES TO KEY EMPLOYEES; MOTION FOR ORDER AUTHORIZING PAYMENT OF PRE-PETITION AND POST-PETITION WAGES AND ASSOCIATED TAXES TO TERMINATED EMPLOYEES

The above-captioned Debtor (rhe "Debtor") moves this Court pursuant to sections 105, 363(b), 363(c), 503(c)(3) and 507 of the Bankruptcy Code and North Carolina General Statute § 44-5.1 for the entry of an order authorizing and approving the Debtor's payment from cash collateral of i) retention bonuses to key employees and ii) pre-petition and post-petition wages and associated taxes to terminated employees. The Debtor, in support of this relief, respectfully states as follows:

### JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. Sections 157 and 1334 and the Amended Standing Order of Reference from the United States District Court. This is a core proceeding pursuant to 28 U.S.C. section 157(b).

2. Venue for this matter is proper in this district pursuant to 28 U.S.C. sections 1408 and 1409.

3. The bases for the relief requested herein are sections 105, 363(b), 363(c), 503(c)(3) and 507 of the Bankruptcy Code.

### PRELIMINARY STATEMENT

4. The Debtor was founded in 1998. It provides financing for automobile dealerships. From 1998 to 2009 the Debtor focused on a point of sale special finance program. In 2010, the Debtor added a program offering financing to ABHPH (Buy Here Pay Here) dealers. In 2011, the Debtor developed and trademarked a program known as ABHPH in a Box. BHPH in a Box provides a wide array of benefits to BHPH dealers including capital to fund receivables and floor plan lines to fund inventory. The Debtor offers BHPH dealers services including training, insurance tracking and financial reporting. s package to assist dealers in many aspects of running a BHPH dealership. The Debtor operates in 10 states.

5. Several factors, including lack of profitability, apparent insolvency, and expenses related to litigation, caused the Debtor to make a business decision to liquidate its business in Chapter 11. The

Debtor filed a voluntary Chapter 11 petition on March 15, 2018 (the "Petition Date").

6. The Debtor's assets consist primarily of receivables due to it from various automobile dealers. The Debtor estimates that it will take four to seven months to liquidate its assets in a manner that will maximize the return for creditors. The Debtor further estimates that, as of the Filing Date, the value of its assets was approximately $14,870,000.00. The ultimate value derived from the liquidation of these assets could be more or less. The claims of creditors alleged to be secured by liens against these assets total approximately $17,317,000.00. Hamilton State Bank, a Georgia banking corporation ("HSB") contends that the outstanding principal balance of the indebtedness owed by ACE as of the Petition Date is approximately $10,416,450.75 (not including claims for interest, charges, fees, expenses, penalties or other possible amounts), and that the claim is secured by a first priority lien and security interest on substantially all of the assets of the Debtor. Several other parties, mostly insiders of the Debtor (the "Subordinated Secured Claims"), allege claims totaling approximately $6,900,000.00, which may also be secured by substantially all of the Debtor's assets. It is believed that the Subordinated Secured Claim holders have signed subordination agreements providing that HSB has a superior lien on the Debtor's assets.

7. General unsecured claims are estimated to be approximately $934,000.00. By operation of 11 USC Section 506, to the extent that the allowed claims of the Subordinated Secured Creditors are not paid from the liquidation of collateral, the claims become general unsecured claims. Assuming that the value of collateral and the estimated claims are accurate, after the payment of HSB's allowed claim there could be an additional estimated $2,450,000 of general unsecured claims. The Debtor has at least $550,000.00 of preference claims and a free and clear Audi A8 automobile that are not subject to liens, which could provide unsecured creditors with more than a *de minims* dividend. The claims of all creditors are subject to objection at this time.

8. The Debtor continues to operate its business as a Debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No official committee of unsecured creditors has been appointed.

## PAYMENT OF RETENTION BONUSES

9. The Debtor is requesting approval of Key Employee Retention Plan ("KERP") whereby certain employees are given retention bonues. The Debtor makes this request to provide appropriate incentives to certain key employees of the Debtor ("Key Employees") to (a) maximize the value of the Debtor's assets in the liquidation process and (b) preserve the value of the Debtor throughout the liquidation to provide an incentive for Key Employees to stay on during the stress and uncertainty of the Debtor's liquidation.

10. Attached hereto as Exhibit A is a list of employees whom the Debtor wishes to designate at Key Employees, their job description, the proposed retention bonus, and the date on which the bonus would be paid (subject to the Key Employee remaining an employee of the Debtor at that time). The Debtor believes that to secure the continued efforts of the Key Employees, it must implement a KERP. The Debtor believes that the KERP, as proposed herein, is reasonable and within typical market practice based on the facts and circumstances of this chapter 11 case. The Debtor also believes the KERP will serve its intended purpose— to retain the Debtor's Key Employees in this chapter 11.

11. Payment of the amounts under the KERP will be critical to maximizing proceeds in the

chapter 11 case. The employees subject to the KERP are all critical, irreplaceable employees. They have assumed, and will continue to assume, significantly greater responsibilities as a result of this chapter 11 case.

12. The Key Employees are not insiders. Instead, the Key Employees were selected for participation in the KERP because they are not members of senior management and are not insiders for purposes of the Bankruptcy Code, but are nonetheless critical and practically impossible to replace without substantial disruption. Although the Key Employees are vital to the Debtor's business, they do not have the ability to influence the direction of the Debtor's business operations. No Key Employee is an owner, officer or director of the Debtor.

13. The proposed KERP should be evaluated under the business judgment standard. Because the KERP does not include insiders, the applicable standard for evaluating the appropriateness of the KERP is provided by section 503(c)(3) of the Bankruptcy Code. Section 503(c)(3) permits payments to a debtor's employees outside the ordinary course of business if those payments are justified by "the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). The use of estate property outside the ordinary course of business under section 363(b)(1) is entrusted to the sound business judgment of a debtor. *See, e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d. Cir. 1996) ("[U]nder normal circumstances the [bankruptcy] court would defer to the trustee's [or debtor-inpossession's] judgment so long as there is a legitimate business justification.") (citation omitted); *Computer Sales Int'l, Inc. v. Fed. Mogul Global (In re Fed. Mogul Global, Inc.)*, 293 B.R. 124, 126 (D. Del. 2003) ("[I]n the Third Circuit, a court should approve a debtor's use of assets outside the ordinary course of business if the debtor can demonstrate a sound business justification for the proposed transaction.") (citations omitted). There is a reasonable relationship between the KERP and the desired results—retaining the Key Employees—which alone should qualify the KERP as a sound exercise of the Debtor' business judgment. A debtor's retention plan is a proper exercise of business judgment when it allows the debtor to avoid the cost and delay associated with the loss of personnel and their institutional knowledge. *See In re Residential Capital, LLC*, 491 B.R. 73, 85 (Bankr. S.D.N.Y. 2013) (approving retention plan for non-insiders because of the "continuity promoted, and the institutional knowledge preserved, by the retention of such employees"). The Debtor'sKERP is designed for such a purpose.

14. The Debtor cannot afford to lose the Key Employees—employees who have the experience and knowledge necessary to manage and conduct the liquidation of the Debtor's assets. The vast majority of the Key Employees have years of institutional knowledge about the Debtor's operations. All of these individuals have many employment options available to them, and without the approval and implementation of the KERP, may pursue new opportunities. Costly and distracting turnover of Key Employees would negatively and severely impact the Debtor' ability to complete the successful sale of their businesses. The Key Employees include:

**A.    *Accounting***

      i.    Rachel Pillar- Accounting/HR Manager- Rachel is solely responsible for all HR duties including payroll and benefit payments including plan administrator for 401K policies. She is responsible for all financial reporting weekly, monthly and quarterly. She is knowledgeable in every aspect of our accounting department. Her leaving would cripple the entire company. She has 15+ years of experience in accounting and a Master's Degree. Replacing her is close to impossible.

    ii.  Nicole Gregory- Accounts Payable/ Lead employee over all daily accounting work. She handles all daily ACH transactions and deposits. Her position is integral in month end reconciliations and is learning as much back up as she can of our accounting manager's duties. Her knowledge of how the Debtor operates would be extremely challenging and costly to obtain a new person without paying double the compensation for a short term fill in.

There is currently one other accounting member that handles daily transactions and has been actively interviewing for new positions. His departure in inevitable and will create more work for other employees, which will lead to increased job stress.

  **B.**  ***Title/Repo Liquidation***

Historically, the Debtor's title department consisted of a title manager, team lead and two title clerks. Rightsizing in late summer of 2017 eliminated the manager position and additional responsibilities were picked up by the remaining three. A title clerk resigned prior to the bankruptcy leaving two. Another title clerk has resigned, leaving only one employee serving in that roll.

Carla Moorefield- Title Department Team Leader (5 ½ years with the Debtor)- Moorefield is now the last employee remaining in the title department and is also the key employee related to repossession notices, transports to auctions, getting inventory aligned to sell and post-sale notifications. She has been actively interviewing for new positions due to the clear uncertainty of AMAC. She is extremely knowledgeable and employable and I believe she is more than capable obtaining similar employment at the same or more pay.

  **C.**  ***Risk Department***

    i.  Arinda (Rindy) Stokes- Auditor (5 ½ years with the Debtor)- Rindy is extremely valuable asset to the Debtor not only related to her audit capabilities, but also the cross training she's obtained over her years with the Debtor. She began in the accounting department, also has experience as a dealer rep and is the lead/only employee currently knowledgeable to assist Robin Milestone liquidating dealers' portfolios related to supplying contract documents, detail to verify guarantees required for sale of accounts and payoff quotes appropriate to cut-offs in time sensitive dynamic situations. Her cross-training adds bench strength to several departments in addition to her aptitude to learn new skills. She has been actively seeking new employment and it is extremely likely she may leave in the next 30 days due to uncertainty.

    ii.  Eric Cogswell- Risk Manager- (3 years with the Debtor)- Eric is a key employee related to risk mitigation, payment reconciliations and understanding the Debtor's dealer agreements. He underwrote new dealer signups and has experience identifying risk, handling the Debtor's notification process of defaulted dealers and monitoring compliance towards payment reconciliations. He has an extensive skill set in building and monitoring risk mitigation tools and provides stability and bench strength in the event of other key employee departures. Eric has x+ years in the automotive industry and a Degree in Accounting.

**D.    Customer Service**

    i.  Robin Milestone- Director of Customer Service (6 years with the Debtor)- Robin is a key member of management

    ii. Nerfettie Ellis-Jordan- Customer Service Manager (6 years with the Debtor), Nerfettie is a key member of management with the most direct reports in the company and is responsible for managing the customer service/collections department to collect payments and mitigate losses. She carries an unmeasurable characteristic related to employees' loyalty to. She has over 20 years of experience in subprime auto finance servicing/collections and is responsible for the repossession processes including applicable notifications. Her experience, work ethic and commitment positions her to retain high level offers in the industry.

    iii. Chasitie Gainey- Customer Service Rep/Repo company follow up (5 1/2 years with the Debtor)- Chasitie is the only trained employee to collect back end, high risk accounts that would otherwise lead to repossessions and losses. She is the only front line employee that works directly with repo agents to pick up vehicles when needed. She is also the primary backup to Nerfettie managing daily collection aspects.

    iv. Robert Troy- Dealer Servicing Representative (8 years with the Debtor)- Robert has the most seniority within the customer service department and the most experience working with our dealers on the day to day aspects of dealer servicing. He monitors dealers are posting payments and reporting repos timely. He is the front line employee of dealer servicing.

    v.  Mike Evans- Dealer Servicing/Customer Service Rep- (5 ½ years with the Debtor)- Mike is a "Swiss army knife" employee with a skill set to service both dealers and customers at a high level. He handles every situation, especially escalated events with extreme care. His flexibility and aptitude to learn new tasks makes him vital to the company's liquidation. His performance and experience will allow for him to obtain higher level employment in his next situation

## PAYMENTS TO TERMINATED EMPLOYEES

15,    The Debtor further seeks the authority to pay the net and gross payroll obligations, pre-petition and post-petition, of certain terminated employees (the "Terminated Employees") as shown on Exhibit B attached hereto.

16.    All of the pre-petition obligations were incurred within the 180 days prior to the Petition Date, and would thus be eligible for priority status pursuant to 11 U.S.C. Section 507(a)(4). Furthermore, the holders of pre-petition wage obligations have lien rights pursuant to North Carolina law, prior to all other liens on the Debtor's assets, which should be paid to me before any payment is made to any other secured creditor.

17. North Carolina General Statute § 44-5.1. ("Wages for two months' lien on assets") provides:

**In case of the insolvency of a corporation, partnership or individual, all persons doing labor or service of whatever character in its regular employment have a lien upon the assets thereof for the amount of wages due to them for all labor, work, and services rendered within two months next preceding the date when proceedings in insolvency were actually instituted and begun against the corporation, partnership or individual, which lien is prior to all other liens that can be acquired against such assets: Provided, that the lien created by this section shall not apply to multiple unit dwellings, apartment houses, or other buildings for family occupancy except as to labor performed on the premises upon which the lien is claimed. This section shall not apply to any single unit family dwelling. (1901, c. 2, s. 87; Rev., s. 1206; C.S., s. 1197; 1937, c. 223; 1943, c. 501; 1955, c. 1345, s. 4.)**

18. All of the post-petition obligations would be eligible for Administrative Expense claim status pursuant to 11 U.S.C. Section 503.

WHEREFORE, the Debtor respectfully request that the Court grant the relief sought herein.

Dated: April 27, 2018.

                                                  **THE HENDERSON LAW FIRM**

                                                  /s/James H. Henderson
James H. Henderson
State Bar No. 13536
1201 Harding Place
Charlotte NC 28204-2826
Telephone:    704.333.3444
Facsimile:    704.333.5003
Email:    henderson@title11.com

## ACE: EMPLOYEE RETENTION PROPOSED BONUSES

| Employee Name | Job Description | Retention Bonus | Anticipated Payment Date |
|---|---|---|---|
| Eric Cogswell | Risk / Audit Manager | $ 3,000 | July 2018 |
| Nicole Gregory | Accounting / Accounts Payable | $ 3,000 | September 2018 |
| Carla Morefield | Title Manager | $ 4,000 | September 2018 |
| Arinda Stokes | Risk / Audits / Buyouts | $ 5,000 | September 2018 |
| Michael Evans | Customer Service | $ 3,500 | September 2018 |
| Chasitie Gainey | Customer Service | $ 3,000 | October 2018 |
| Robert Troy | Customer Service | $ 3,500 | October 2018 |
| Nerfettie Ellis-Jordan | Customer Service Manager | $ 7,500 | November 2018 |
| Robin Milestone | Director of Customer Service | $ 7,500 | December 2018 |
| Rachel Pillar | Accounting / HR Manager | $ 10,000 | December 2018 |



EXHIBIT A

## ACE: TERMINATED EMPLOYEES PROPOSED PAYMENTS

| Employee Name | Net Payroll Owed to Employees | | Employer Liability (Tax & 401k) | |
|---|---|---|---|---|
| | Pre-Petition | Post-Petition | Pre-Petition | Post-Petition |
| Alex T Wiley III | $ - | $ 635.46 | $ - | $ 158.47 |
| Sharon L Hartis | $ 503.24 | $ 12.94 | $ 86.74 | $ 1.32 |
| David A Gierasch | $ 153.09 | $ 20.84 | $ 18.07 | $ 2.46 |
| Robin B Bristow | $ 976.59 | $ 65.23 | $ 160.32 | $ 9.63 |
| Deborah J Duffy[1] | $ 358.23 | $ 1,049.06 | $ 80.76 | $ 171.55 |
| Lourdes Ramirez | $ 374.24 | $ 70.43 | $ 48.80 | $ 9.18 |
| Erica M Rogers | $ 599.18 | $ 60.98 | $ 110.88 | $ 9.15 |
| Arely L Vega Lugo | $ 644.48 | $ 59.54 | $ 117.02 | $ 9.94 |
| Karen Barnett | $ 4,214.82 | $ 85.76 | $ 787.56 | $ 14.49 |
| Charles Burlacu | $ 1,201.36 | $ 54.57 | $ 235.86 | $ 9.13 |
| Benjamin J Collison | $ 2,338.96 | $ 452.49 | $ 482.20 | $ 73.65 |
| Christopher A Jolie | $ 2,244.83 | $ 141.28 | $ 473.72 | $ 25.23 |
| Donna Lawrence | $ 817.32 | $ 115.25 | $ 144.93 | $ 13.57 |
| | $ 14,426.34 | $ 2,823.83 | $ 2,746.86 | $ 507.77 |

[1] Wages and Taxes Owed for both 3/30/18 and 4/13/18 payrolls for this employee due to time periods covered in each pay period and the employees termination date of 3/27/18.


EXHIBIT B